**ARLINGTON TRUST COMPANY, Inc.,**
**Plaintiff,**

v.

**MONTGOMERY BANKING AND TRUST COMPANY et al., Defendants.**
**Civ. A. No. 4178.**

United States District Court
E. D. Virginia,
Alexandria.

Jan. 5, 1968.

James H. Simmonds, Arlington, Va., for Arlington Trust, plaintiff.

Stanley Hirsch, Alexandria, Va., for Montgomery Banking.

Plato Cacheris, Alexandria, Va., for T. Calvin Owens.

Harry P. Hart, Alexandria, Va., for Service Electric.

James C. Cacheris, Alexandria, Va., for Continental.

## MEMORANDUM OPINION

OREN R. LEWIS, District Judge.

The collecting bank, Arlington Trust Company, Inc., interpleaded the above-named defendants pursuant to 28 U.S.C. §§ 1335 and 2361 to determine the ownership and the rights of the parties in the proceeds of six checks totaling $69,471.28.

The disputed funds were deposited in the registry of this Court ($32,465.69 in cash, with a corporate surety bond for the balance).

T. Calvin Owens, Inc. was the general contractor and the drawer of the checks in question. Continental Corporation was the subcontractor and co-payee with Service Electric Supply Corporation of the six checks in question. Service Electric Supply Corporation was also the supplier of material to Continental and surety on Continental's performance and payment bonds. The Montgomery Banking and Trust Company had the bank account of T. Calvin Owens, Inc. against which the six checks were drawn. Arlington Trust Company, Inc. had the bank account of Continental Corporation and was the collecting bank of the six checks in question.

This controversy first arose some two months after the last of the checks in question cleared the Montgomery bank. Owens then for the first time questioned the endorsements and lack of endorsements on the six checks it had issued to Continental and Service. It claimed Service failed to endorse two of the checks and presented an affidavit by the president of Service that the endorsements of Service on the other four checks were forgeries.

Montgomery then returned the six checks to Arlington—Arlington proceeded to charge them back to Continental— Continental did not at that time have sufficient funds in its account in Arlington to cover the checks—it did have $32,465.69—that money was impounded by Arlington.

Upon being advised of the situation, Continental claimed the Service endorsements were not forgeries but had been signed by authority of C. H. Culler, president of Service. It made affidavit to that effect.

Arlington then returned the checks to Montgomery without repayment, having ascertained in the interim that Montgomery had not recredited the money to Owens' account. This suit then followed.

Prior to this controversy Owens and Continental both claimed the other had breached their contract—that controversy together with the cross claims, here dismissed, are now pending in the United States District Court for the District of Columbia.

The stipulations of the parties in this case disclose that Owens gave Continental twelve checks in payment for work performed under its subcontract, six of which were payable to Continental only. (Payment of these six checks is not in dispute.) The other six were payable to Continental and Service. Continental deposited the checks to its account in the Arlington Trust Company—Arlington sent them to Montgomery for collection through regular banking channels. Two of the co-payee checks were endorsed by Continental only. (Neither Arlington nor Montgomery noted this omission.) Four of the co-payee checks were facially endorsed by both Continental and Service. Montgomery paid the six checks as presented and charged them to Owens' account. The canceled checks were returned to Owens with its monthly statement.

No one questioned Service's endorsement or lack of endorsement on any of the checks until some two months after the last co-payee check was paid. Owens then made claim against Montgomery for negligently honoring two of its checks absent proper endorsements and for honoring four of its checks on forged endorsements. Montgomery then made claim against Arlington as guarantor of all prior endorsements.

Continental purchased most, if not all, of its electrical supplies from Service. Continental's account with Service was paid in full before this dispute arose.[1]

At the request of Owens and Continental, Service became the surety on Continental's performance and payment bonds. Undated performance and payment bonds were executed by Service and delivered to Owens some two or three weeks after the date of Continental's subcontract.

Continental authorized Owens, by letter dated April 15, 1965 (some two or three months after the delivery of the performance and payment bonds), to make checks due it for work performed payable to both Service and itself.

Owens made six of the checks[2] payable to Continental (no explanation was given for so doing) and six payable to Continental and Service.

The circumstances surrounding the giving of this letter and Service's endorsement and lack of endorsement of the six checks in question are in dispute. A brief summary of the testimony supporting the various contentions of the parties in respect thereto follows.

---

1. Continental's last check in payment of this account in the amount of $665.00 had not cleared the Arlington Trust Company prior to the time Arlington froze Continental's account.

2. May 10, 1965, payable to Continental.
 June 10, 1965, payable to Continental and Service.
 July 10, 1965, payable to Continental.
 July 14, 1965, payable to Continental.
 August 16, 1965, payable to Continental and Service.
 September 14, 1965, payable to Continental and Service.
 October 14, 1965, payable to Continental and Service.
 November 9, 1965, payable to Continental.
 December 15, 1965, payable to Continental.
 January 21, 1966, payable to Continental.
 February 10, 1966, payable to Continental and Service.

 March 14, 1966, payable to Continental and Service.

McAteer, the president of Continental, testified that Greenville, secretary of Owens, called him on the telephone and asked him if he would have any objection to Service being made a joint payee because it was supplying materials to the job.

Greenville says he made the telephone call at the request of Whalen (a friend of Owens, who claimed he told Service he would arrange to have the checks so drawn) and told McAteer that he had arranged to buy material from Service and it would be a protection on the payment of the bills "as you were a new customer and unknown to him. * *"

McAteer says he complied with Greenville's request because he had no objection to this method of assuring Service that it would be paid for materials furnished. He further says he never talked with Service about allowing it to be made a co-payee on their checks.

Both McAteer and Greenville agree there never was any discussion between them in re making Service a co-payee so as to protect it as a surety.

Continental's subcontract with Owens and the performance and payment bonds are all silent on making Service a co-payee with Continental on all checks paid Continental by Owens for work performed on the job.

Culler, president of Service, says he believed the question of making Service a co-payee was discussed prior to his agreeing to become a surety. He says he wanted the checks payable to his company so that he would be sure that the suppliers were paid and that the surety obligations were performed. Culler further testified that he called someone in Owens' office (he does not remember with whom he spoke) and was told they had a letter from Continental authorizing them to make the checks payable jointly. Culler further testified that he never talked to Owens or Continental or to anyone about the matter thereafter until the dispute arose over Service's endorsements.

He says he did not know how the checks were being drawn although he did know that Continental was being paid by Owens every month and that he was being paid promptly for the materials he furnished. He said he also knew subcontractors could not ordinarily operate without getting paid by the general contractor.

Culler admits he was very lax in the matter. He said he never did follow it up to see whether or not his name was on the checks. He further testified that he never saw or endorsed, or authorized anyone to endorse, Service's name on any of the six checks in question.

McAteer, his secretary and another office employee of Continental all testified Culler not only expressly authorized them to endorse Service's name on four of the checks but told them how to properly write his name as president.

Neither McAteer nor any of his employees could give any explanation of why two of the checks were deposited without putting Service's endorsement thereon, except to say that it had to be an oversight.

Upon the record thus made, the Court finds that:

(1) The six co-payee checks in question were paid to Continental for work performed under its subcontract with Owens.

(2) The proceeds from the six checks were deposited in Continental's account in the Arlington Trust Company.

(3) The six checks were sent to Montgomery for collection through regular banking channels; Montgomery paid the checks and charged them to Owens' account.

(4) Service was promptly and fully paid for all materials furnished Continental. (Continental remains liable for the payment of its $665.00 check made payable to Service which was not cleared by the Arlington Trust Company.)

(5) Service's endorsements on the four co-payee checks in question were authorized by the president of that corporation—they are not forgeries.

(6) Arlington Trust Company was negligent in proceeding to collect the two co-payee checks in question without first determining they were properly endorsed.

(7) Montgomery Banking and Trust Company was negligent in paying the two co-payee checks in question absent proper endorsements.

(8) Continental at Owens' request authorized Owens to make Service a co-payee of its checks.

(9) Service was made a co-payee on Continental checks received from Owens for work performed to assure prompt payment of Continental's account with Service for materials furnished.

(10) It was never intended by any of the parties that Service could refuse to endorse or hold the proceeds from any of the co-payee checks as security for Continental's performance bond.

### Conclusions

Continental is entitled to the money ($32,465.69) heretofore deposited in the registry of the Court, out of which must be paid the $665.00 Service check. This was the amount of money in Continental's account in the Arlington Trust Company, seized by that bank to regain the funds previously deposited via the co-payee checks.

■ The Arlington Trust Company was legally permitted, with or without negligence on its part, to charge these checks back to its customer (Continental) on receipt of the affidavit from the Montgomery Banking and Trust Company indicating that Service's endorsements on four of the co-payee checks were forgeries and that Service's endorsement was missing from two of the checks. (Continental was negligent in depositing two of the co-payee checks for collection absent Service's endorsement.)

Continental's deposit slip contained the following language:

"Items received for deposit or collection are accepted on the following terms and conditions. This bank acts only as depositor's collecting agent and assumes no responsibility beyond its exercise of due care. All items are credited subject to final payment and to receipt of proceeds of the final payment in cash or solvent credits for this bank at its own office."

Section 8.4–207 of the Virginia Code provides:

\* \* \* \* \* \*

"(2) Each customer and collecting bank who transfers an item and receives a settlement or other consideration for it warrants to his transferee and to any subsequent collecting bank who takes the item in good faith that

"(a) he has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title and the transfer is otherwise rightful; \* \* \*

\* \* \* \* \* \*

"In addition each customer and collecting bank so transferring an item and receiving a settlement or other consideration engages that upon dishonor \* \* \* he will take up the item."

Arlington was clearly negligent in accepting for collection the two co-payee checks absent the endorsement of both payees. As the collecting bank it guaranteed to the Montgomery Banking and Trust Company all prior endorsements. Montgomery had the right to look to Arlington for repayment upon Owens' and Service's claim that Service's endorsements on the checks were forgeries.

■ General banking law requires that all payees must endorse in order to negotiate the instrument. Had Service's endorsement of the four checks in question been forgeries, Arlington would have been liable for repayment to Montgomery had the checks been improperly paid—but such was not the case here.

■ The Court has found from the evidence that Service had no interest in the proceeds from the six checks—it had been fully paid for all materials furnished Continental. The proceeds from the checks were credited to Continental's account in the Arlington Trust Company

—they belonged to that company. See Commercial Credit Corp. v. Empire Trust Company (C.C.A.8) 260 F.2d 132. The bank in that case was relieved from liability for paying a check drawn to two payees although the endorsement of one of the payees was forged because such payee had no legal interest in or right to any of the proceeds of the check and the check went to the payee entitled thereto.

■ Maryland was the situs of the drawer's bank—the place where the six checks were paid. The highest court of that state, in Coplin v. Maryland Trust Company, 222 Md. 119, 159 A.2d 356, stated the applicable rule to be as follows:

"It has long been held that, despite the almost universal custom of requiring a payee to endorse a check before payment, a bank is protected if it pays without endorsement, as long as the payee actually receives the money ordered by the drawer to be paid. (Citing cases.)

"The rationale of these holdings underlies the many decisions that even though a drawee bank pays a check of a depositor on the forged or unauthorized endorsement of the payee named therein, if the proceeds of the check or the benefit of the proceeds are received by the payee, no recovery can be had against the bank by the drawer, for the reason that if the person entitled to receive the proceeds actually receives them or the benefit of them, the drawer has suffered no loss and the technical breach of duty by the bank has occasioned no harm." (Citing cases.)

See also Gotham-Vladimir Advertising, Inc. v. First National City Bank and Chemical Bank, New York Trust Company v. First National City Bank, 27 A.D.2d 190, 277 N.Y.S.2d 719, decided March 7, 1967. It was there held that a drawer is precluded from recovering from the drawee bank for paying his check on a forged or unauthorized endorsement where the proceeds of the check actually reached the person whom the drawer intended to receive them.

■ Having failed to sustain its charge of forgery, Owens now seeks only repayment of the face amount ($24,281.34) of the two checks that were charged against its account absent Service's endorsement. This claim is totally lacking in merit. By so decreeing Owens would be unjustly enriched by collecting from its collector bank money which has reached the payee to whom it intended the money to go.

The evidence in this case clearly establishes that Owens paid the money to Continental upon approval of its requisitions for work performed under its subcontract.

Service Electric Supply Corporation claims only the right to withhold its signature from three of the checks in question—the two it did not endorse and the October or February check which bore its claimed endorsement—as its security under its performance bond.

■ The burden of proof is on Service to establish such right. This it has failed to do. All witnesses who testified re the subject matter, except the president of Service, said no one ever suggested that the co-payee checks were to be held as security for the performance bond—the president said he believed it was discussed—he did not state that he had such an understanding or agreement with Continental or Owens. No such security provisions are mentioned in the bond instruments.

Neither Arlington nor Montgomery claims any part of the funds on deposit in the registry of the Court. Arlington prays that its bond and corporate surety be discharged.

Each party must bear its own costs and attorneys' fees. The cost of the original transcript filed herein, necessary for the determination of this case, shall be paid in equal shares by the five parties through their counsel of record, and the Court Reporter has been directed to bill them accordingly.

The Court having determined that the Arlington Trust Company is free of liability for all actions on its part in collecting and depositing the six co-payee checks to the account of Continental and impounding the balance in Continental's bank account under the circumstances here disclosed, and that the Montgomery Banking and Trust Company is free of liability for all actions on its part in paying the said six co-payee checks and charging them against the drawer's (Owens') account, the corporate surety bond heretofore deposited with the Court will be discharged and returned to the maker.

Counsel for Continental should forthwith prepare an appropriate order in accordance with this memorandum opinion, submit it to other counsel of record for approval as to form, and then to the Court for entry.